# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JACQUELYN MOORE,

      Plaintiff,

v.

JESSE PATTERSON ET AL.,

      Defendants.

      Civil No. 24-1600-BAH

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Jacquelyn Moore ("Plaintiff" or "Moore") brought suit against Frederick County Sheriff's Deputy Jesse Patterson ("Patterson") and two unknown deputies alleging violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count I) and the Fourth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983 (Count II), as well as false arrest (Count III), false imprisonment (Count IV), and negligence (Count V) under Maryland law. *See* ECF 27 (amended complaint).[1] Moore also brings suit against Jaroth Ramon Armando Ralon Perez ("Perez"), alleging one count of negligence (Count VI). *See id.* All claims arise out of the aftermath of a collision that occurred after Perez fled a car stop initiated by Patterson. Moore, an innocent bystander whose car was struck by Perez's, alleges that the accident caused her serious injuries. Though she sues Perez for damages directly resulting from the accident, she also takes issue with Patterson's actions immediately after the accident. *Id.* at 11–12. Specifically,

---

[1] The original complaint is docketed at ECF 1. Moore also brought a breach of contract claim against USAA Casualty Insurance Company. *See* ECF 1, at 12; ECF 27, at 14. However, the parties stipulated to the dismissal of that claim with prejudice on April 23, 2025. ECF 46. Accordingly, USAA Casualty Insurance Company is no longer a defendant in this action.

Moore also alleges that immediately following the accident, Patterson, and possibly other unnamed deputies, effectuated her "unnecessary and unlawful arrest, assault, detention, and imprisonment." *Id.* at 10.

Pending before the Court is Patterson's motion for summary judgment. ECF 48. Moore filed an opposition, ECF 53, and Patterson filed a reply, ECF 56. Moore has also moved to file a surreply, ECF 57, which Patterson opposes, ECF 58.[2]  All filings include memoranda of law and exhibits.[3]  The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Patterson's motion is **GRANTED**. Moore is also **ORDERED** to show cause within fourteen (14) days of the issuance of this opinion and implementing order why the unidentified officer defendants should not be dismissed from the action, and Moore is ordered to file a motion for default judgment against Perez or file a report as to why such a motion would be inappropriate within fourteen (14) days of the issuance of this opinion and implementing order.

I.    **BACKGROUND**

A.    **Factual Background**

This case arises out of Patterson's pursuit of a suspected stolen vehicle on September 22, 2021. *See* ECF 27, at 6; ECF 48-2, at 1–8 (incident report); ECF 48-6, at 13–14 (deposition of Moore). The pursuit lasted approximately forty-four seconds and spanned about three-quarters of a mile. ECF 48-10, at 1 (vehicle pursuit report); ECF 48-8, at 11 (deposition of Angleberger).[4]

---

[2] For the reasons explained below, Moore's motion to file a surreply is **GRANTED**. *See infra* note 12.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] Patterson's interrogatories state that he "was not wearing a body worn camera, and his vehicle was not equipped with a dash camera at the time of the occurrence." ECF 53-3, at 4.

It began at approximately 6:30 p.m. when Patterson, while on patrol for the Frederick County Sheriff's Office, observed a black Infiniti sedan stopped at a red light on Buckeystown Pike near the I-270 entrance ramp. ECF 48-2, at 5; ECF 48-3, at 1 (statement of probable cause); ECF 48-4 (deposition of Patterson), at 28–30. Patterson observed the driver and passenger of the Infiniti, who Patterson identified as two Hispanic men, stare at him and then quickly look away. ECF 48-2, at 5; ECF 48-3, at 1; ECF 48-4, at 30, 33, 37. Based on that interaction, Patterson made a U-turn and approached the Infiniti again, which was still stationary at a red light. ECF 48-2, at 5; ECF 48-3, at 1; ECF 48-4, at 40–41, 43. Once behind the vehicle, Patterson noticed that its registration plate was from North Carolina. ECF 48-2, at 5; ECF 48-4, at 31, 37–38. Patterson ran a registration check on his in-cruiser computer, which returned a National Crime Information Center ("NCIC") "hit" for a stolen registration plate. ECF 48-2, at 5; ECF 48-3, at 1; ECF 48-4, at 44.

Patterson next contacted the Frederick County Emergency Communications Center, and a dispatcher confirmed the hit and advised that the registration plate was reported stolen through the City of Frederick Police Department. ECF 48-2, at 5; ECF 48-3, at 2. Patterson asked the dispatcher whether the registration plate or the vehicle itself had been reported stolen. ECF 48-2, at 5; ECF 48-3, at 2; *see also* ECF 48-4, at 51–61, 116. The dispatcher advised that the stolen plate belonged to an Infiniti.[5] ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 61–62, 64–67, 116–

---

[5] The incident report reflects that this advisement turned out to be inaccurate—although the stolen tag was registered to a black Infiniti, a later "check of the VIN on the suspect vehicle stated it used to be associated with another Maryland tag, but was not associated with this stolen tag." ECF 48-2, at 7. According to the incident report, the driver later "admitted to stealing the North Carolina registration plate from a similar looking black Infiniti in an unknown apartment complex parking lot in Frederick." *Id.*; *see also* ECF 48-4, at 181.

17. Patterson continued to follow the Infiniti during this conversation with the dispatcher. *See* ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 62–63, 122. While he did so, the Infiniti made a series of turns that Patterson construed as an attempt to create distance from him. ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 122–23. Eventually, the vehicle turned into the parking lot of a gas station and stopped at a gas pump. ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 62–63, 123. Patterson positioned his cruiser behind the Infiniti and, at some point, activated his overhead lights. ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 124, 131–32. He also requested that dispatch send a backup unit. ECF 48-3, at 2.

Patterson exited his cruiser and told the Infiniti's occupants to stay inside the vehicle. ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 127–29. The driver of the vehicle opened his door. ECF 48-2, at 5; ECF 48-3, at 2; ECF 48-4, at 132. Patterson drew his firearm and ordered the driver to shut the door and the occupants to stick their hands out of the vehicle's windows. ECF 48-2, at 5; ECF 48-3, at 3; ECF 48-4, at 130, 136. Both occupants complied at first, but then Patterson observed the Infiniti's red brake lights illuminate and heard the engine revving. ECF 48-2, at 5; ECF 48-3, at 3; ECF 48-4, at 136–37. The Infiniti then sped out of the parking lot and turned north onto Buckeystown Pike. ECF 48-2, at 5; ECF 48-3, at 3; ECF 48-4, at 139. Patterson returned to his cruiser, alerted the Frederick County Emergency Communications Center that the Infiniti had fled, activated his overhead siren, and gave chase down Buckeystown Pike. ECF 48-2, at 5–6; ECF 48-3, at 3; ECF 48-4, at 139.

Buckeystown Pike, also known as Maryland Route 85, is a busy thoroughfare with several lanes of traffic in each direction. *See* ECF 48-4, at 160–61, 212; ECF 48-5, at 1; ECF 48-8, at 11. Patterson accelerated to around eighty-six miles per hour to chase the Infiniti, which was approximately one intersection ahead. ECF 48-2, at 6; ECF 48-3, at 3; ECF 48-4, at 140. However,

4

Patterson reduced his speed at times to maneuver through moderate traffic. ECF 48-2, at 6. Roughly one minute into the pursuit, the Infiniti hydroplaned on wet pavement, hit a median, and crossed into oncoming traffic. ECF 48-2, at 6; ECF 48-3, at 3; ECF 48-6, at 17. The Infiniti briefly traveled onto an adjacent sidewalk and then reentered the roadway and collided with the rear end of Moore's stationary grey Lexus sedan, which was stopped at a red light. ECF 48-2, at 4, 6; ECF 48-3, at 3–4; ECF 48-6, at 18; *see also* ECF 48-7 at 1 (photograph of the accident). Patterson's vehicle also hydroplaned and struck another vehicle. ECF 48-2, at 6; ECF 48-3, at 4; ECF 48-4, at 152.

After checking on the person that his car struck and seeing they appeared uninjured, Patterson ran across the median of Buckeystown Pike towards the Infiniti. ECF 48-2, at 6; *see also* ECF 48-3, at 4; ECF 48-4, at 164, 212. As he approached the accident, Patterson observed the passenger of the Infiniti exit the vehicle and flee into a nearby wooded area. ECF 48-2, at 6; ECF 48-3, at 4; ECF 48-4, at 214. At this point, Patterson's and Moore's account of the facts diverge.

Moore stated at her deposition that after her vehicle was struck, she attempted to exit her car. ECF 48-6, at 19–20, 42. Moore recalled seeing several officers respond to the scene but stated that only one officer approached her vehicle. *Id.* at 20–22; ECF 48-12, at 3 (Moore's response to interrogatories) ("She saw several officers running across the street towards the accident with guns drawn as they blocked the intersection."). According to Moore, an officer approached the door of her vehicle with his firearm drawn and stated: "Let me see your hands." ECF 48-6, at 20, 41–42; ECF 48-12, at 2–3. Moore states that she informed the officer that she was a victim and was in pain, and the unnamed officer then instructed her to get back in her car and called for paramedics. ECF 48-6, at 20; *see also* ECF 53-4, at 4 (Moore's interview with insurer).

At no point, according to Moore, did the responding officer ever make physical contact with her or "put [her] on the ground." ECF 48-6, at 43. Moore was not able to approximate the amount of time the interaction lasted for, although she noted that "it seemed like forever." *Id.* at 43. Nor was she able to remember at her deposition what the officer looked like, noting that "everything happened so fast," *id.* at 22, but Moore did recall that he "was white," possibly wearing a black shirt, and "pointing a gun" at her car door, *id.* at 22, 41–42. However, in an affidavit attached to her opposition to Patterson's motion, Moore stated that although at the time of her deposition she could not clearly remember or identify Patterson, after seeing Patterson at his deposition on Zoom, she "can definitively say that he was the Frederick County Sheriff Deputy who pointed his gun at [her] on 9/22/21 and ordered [her] in [her] vehicle." ECF 53-2, at 1 (affidavit of Moore).

Patterson denies Moore's allegations. Patterson stated at his deposition that the Infiniti's passenger side was facing him when he arrived on the scene, so he ran around the back of the car to the driver's side of the vehicle. ECF 48-4, at 164, 213. Patterson asserted that he did not run around the front of Moore's vehicle but rather was well behind it. *Id.* at 164–66, 171, 204, 213. Patterson further stated that he "never approached" Moore's vehicle and "did not point a firearm at her," and when asked who told her to "show me your hands," he responded, "I don't know. I was focused on arresting somebody." *Id.* at 165–66, 171, 213. Patterson noted that another officer, Sergeant Taylor Angleberger, arrived on the scene after him, although Patterson could not say when precisely Sergeant Angleberger arrived. *Id.* at 166–67, 206. Sergeant Angleberger stated at his deposition that he had joined the pursuit and was "probably about a quarter mile" behind Patterson. ECF 48-8, at 9, 11–12. However, Sergeant Angleberger reported that he did not see the collision that ended the pursuit. *Id.*

6

The driver of the Infiniti was arrested at approximately 6:45 p.m. ECF 48-2, at 6; ECF 48-3, at 4. Patterson stated that when he took the driver of the Infiniti into custody, he observed Sergeant "Angleberger standing on the driver's side of Ms. Moore's vehicle, but he was kind of near the rear of the vehicle." ECF 48-4, at 167, 175. Patterson could not recall whether Sergeant Angleberger was speaking to Moore at that time. *Id.* Patterson stated that he spoke with Moore "[a]t some point eventually," but Patterson believed it was Sergeant Angleberger who spoke with her about her potential injuries and called the ambulance for her. *Id.* at 167–69. Sergeant Angleberger similarly stated at his deposition that he had a verbal exchange with Moore, during which she told him that "her lower back hurt" and that he "asked her to sit in the vehicle" while paramedics were called. ECF 48-8, at 17.[6] Patterson stated that he "was not near Ms. Moore again" that evening because he "had a subject in custody." ECF 48-4, at 169.

Moore was ultimately transported to Frederick Health Hospital for her injuries, which she reports included lower back pain, shoulder pain, and a broken wrist. ECF 48-2, at 6; ECF 48-3, at 5; ECF 48-6, at 27, 29–31; 48-12, at 7–8.

**B.    Procedural History**

On June 3, 2024, Moore filed a complaint against Patterson and others seeking compensatory and punitive damages, in addition to attorney's fees. *See* ECF 1. On September 10, 2024, Moore filed an amended complaint. *See* ECF 27. The parties completed discovery on April 7, 2025, *see* ECFs 42 & 44, and Patterson filed the pending motion for summary judgment on May 6, 2025. That motion is ripe for review.

---

[6] Sergeant Angleberger stated that he "did not use force that evening," draw his firearm, or order Moore to take any action. ECF 48-8, at 13–17. Moore does not contend that Sergeant Angleberger is the officer who approached her with a firearm drawn. *See generally* ECF 53.

## II.  **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black &*

8

*Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    ANALYSIS

In opposing summary judgment, Moore alleges that there are three material facts in dispute that preclude summary judgment: 1) whether or not Deputy Patterson pointed a gun at her; 2) whether or not Deputy Patterson ever spoke to Moore "at the scene of the accident and gave her an unlawful order;" and 3) whether or not Deputy Patterson acted reasonably when he pointed his gun at Moore. ECF 53-1, at 10–11. However, Moore's complaint, and her response to the motion for summary judgment, styles her Fourth Amendment claim as one alleging "false arrest and false imprisonment," not excessive force or the excessive use of weapons.[7] ECF 27, at 8–9 ¶ 39. Even

---

[7] As Moore observes, *see* ECF 53-1, at 15, Patterson's principal memorandum in support of his motion for summary judgment characterizes Moore's Fourth Amendment claim as an excessive force claim, *see* ECF 48-1, at 17. Moore clarifies in her opposition that her claim is not one of excessive force, but of unlawful seizure. *See* ECF 53-1, at 16. In reply, Patterson responds that Moore's clarification is "puzzling" in light of the fact that the amended complaint alleges that Moore was "seized by a use of force." ECF 56, at 7. The Court is not as puzzled; an arrest typically involves the use of some force, or at least a "surrender to the State's show of authority." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In any event, the phrase "excessive force" appears nowhere in Moore's amended complaint, *see* ECF 27, and she raises no arguments relying on the excessive use of force. Indeed, she explicitly challenges Patterson's reliance on cases that address that issue. ECF 53, at 3 ("The Defendant's focus on legal standards involving conduct 'that shocks the conscience' and 'excessive force' has nothing to do with this case. The Defendant is being sued

answering the first two question in Moore's favor, the Court finds that the brief seizure of Moore

in the aftermath of a high-speed chase was reasonable and thus grants summary judgment on that.

ground. Moreover, the Court finds that Patterson is entitled to qualified immunity and alternatively

grants summary judgment on that basis.

### A.    42 U.S.C. § 1983 Claim (Count II)[8]

Moore's second count is brought pursuant to 42 U.S.C. § 1983 and alleges that Patterson

violated her rights under the Fourth and Fourteenth Amendments. ECF 27, at 8. Section 1983

provides a plaintiff with an avenue to "vindicat[e] federal rights." *Albright v. Oliver*, 510 U.S.

266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Section 1983 allows

suits against any "person" acting under color of state law who subjects the plaintiff to "the

deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C.

§ 1983.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the

Constitution or laws of the United States was violated, and (2) that the alleged violation was

committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48

(1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Loftus v. Bobzien*, 848 F.3d

278, 284–85 (4th Cir. 2017); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir.

2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). Section 1983 also requires a

---

for unlawfully seizing the Plaintiff, not for merely using excessive force to affect a lawful
seizure."). Accordingly, the Court will construe Moore's § 1983 Fourth Amendment claim solely
as one alleging that her seizure was unreasonable and not one claiming that the means utilized to
effectuate that seizure were unreasonable.

[8] Patterson begins his arguments by addressing the § 1983 claim (Count II), then shifts to address
Moore's Maryland Declaration of Rights claim (Count I) and her remaining Maryland tort claims
(Counts III, IV, and V). *See generally* ECF 48. Moore responds in a similarly structured fashion.
*See generally* ECF 53-1. The Court addresses the parties' arguments in the same order.

showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable under § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

### 1.    Fourth Amendment

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). Moore alleges that Patterson arrested her "without probable cause or a valid arrest warrant" in violation of the Fourth Amendment. ECF 27, at 8–9 ¶ 39. Again, despite employing language in her response that might suggest otherwise, Moore is explicit that her Fourth Amendment claim alleges "false arrest and false imprisonment," not excessive force or the excessive use of weapons. *Id.*; *see also* ECF 53-1, at 13 ("In this case the rights that were violated were [] Moore's 4th Amendment Rights not to be seized without probable cause and her analogous rights under Article 26 of the Maryland Declaration of Rights. . . . She is not seeking redress for an excessive force claim because no amount of force is permitted to be used when an officer is unlawfully seizing someone."). "[T]he Fourth Circuit has explained that § 1983 incorporates common law torts, such as false arrest and false imprisonment, so as to create a 'special species of tort liability, founded on rights originating in the Constitution.'" *Osborne v. Giordades*, Civ. No. RDB-14-182, 2015 WL 251956, at *5 (D. Md. Jan. 20, 2015) (internal quotation marks omitted) (quoting *Lambert v. Williams*, 223 F.3d 257,

11

262 (4th Cir. 2000)); *see also Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) ("[F]alse

arrest and false imprisonment claims . . . are essentially claims alleging a seizure of the person in

violation of the Fourth Amendment[.]").    "Section 1983 claims for false arrest or false

imprisonment are thus 'properly analyzed as unreasonable seizures under the Fourth

Amendment.'" *Id.* (quoting *McPhearson v. Anderson*, 873 F. Supp. 2d 753, 756 (E.D. Va. 2012)).[9]

### i.    Personal Involvement

"In order for an individual to be liable under § 1983, it must be 'affirmatively shown that

the official charged acted personally in the deprivation of the plaintiff's rights.'" *Wright v. Collins*,

766 F.2d 841, 850 (4th Cir. 1985). Accordingly, claims like Moore's are typically brought against

the seizing or assisting officer. *See Fernandes v. Montgomery Cnty.*, Civ. No. AW-10-CV-752,

2012 WL 1664086, at *3 (D. Md. May 10, 2012).[10]  Here, however, the question of Patterson's

involvement in Moore's alleged seizure is disputed. Patterson argues that Moore has "failed to

---

[9] Moore appears to allege a Fourth Amendment claim premised on both false imprisonment and false arrest. *See* ECF 27, at 8 ¶ 39 ("The acts and omissions of Defendants detailed within this Complaint, including, but not limited to, the seizing of the Plaintiff without probable cause and the false arrest and false imprisonment of Plaintiff, without probable cause or a valid arrest warrant, deprived Plaintiff of her rights under 42 U.S.C. §1983[.]"). Moore does not explain how the claims differ, and the parties discuss them under one basic Fourth Amendment analysis. Thus, the Court will do the same and treat the claims as a single Fourth Amendment unlawful seizure claim. *See Nicholson v. Baltimore Police Dep't*, Civ. No. DKC-20-3146, 2023 WL 4549741, at *4 (D. Md. July 14, 2023).

[10] Even in the absence of personal involvement, "the Fourth Circuit recognizes that law enforcement officers have 'an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers.'" *Machie*, 2013 WL 3353740, at *6 (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002)). "An officer may be liable under § 1983 on a theory of bystander liability if he: '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Id.* (quoting *Randall*, 302 F.3d at 204). However, Moore has not brought a failure to intervene claim. *See* ECF 27. And even if she had, she has not pointed to any evidence before the Court suggesting that Patterson had knowledge of any other unidentified officer's alleged seizure or a reasonable opportunity to prevent it.

adduce a scintilla of evidence suggesting that Deputy Patterson was the law enforcement officer that approached her with his firearm drawn." ECF 48, at 18. Rather, Patterson argues that Moore has only "generally asserted that these actions were taken by an unidentified officer" and stated at her deposition that she was "not even sure that she had any interaction with Deputy Patterson on the day of the incident." *Id.* (citing ECF 48-6, at 25 (noting that in response to the question, "Sitting here today, do you know whether you had any interaction with Deputy Patterson?" Moore responded "No")).

Moore, however, argues that the question of "whether or not Deputy Patterson pointed his gun at Plaintiff Moore and gave her illegal commands that she acquiesced to" represents a genuine dispute of material fact. ECF 53-1, at 7. Moore primarily relies on a sworn affidavit attached to her opposition, in which she affirmatively identifies Patterson as the person who pointed his firearm at her and ordered her into her vehicle. *See* ECF 53-2, at 1. At Moore's deposition, she was not able to remember whether the officer that approached her was Patterson. *See* ECF 48-6, at 22, 21–42. However, Moore explains that "[a]fter seeing Deputy Patterson, at his deposition, which occurred after Moore's deposition, she can now place the name and face of the deputy who pointed his gun at her." ECF 53-1, at 9; *see also* ECF 53-2, at 1. Patterson responds that the Court should regard Moore's affidavit as a "sham." *See* ECF 56, at 2.

The Fourth Circuit has before held that where affidavit and deposition testimony conflicts, a "district court [is] left not with a genuine issue of material fact, but with trying to determine which of several conflicting versions" of a plaintiff's testimony are true. *Rohrbough v. Wyeth Lab'ys, Inc.*, 916 F.2d 970, 976 (4th Cir. 1990) (alteration added) (citing *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir .1984)). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this

would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Barwick*, 736 F.2d at 960 (quoting *Perma Rsch. & Dev. Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969)). Thus, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Id.* at 960; *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

"However, application of the sham affidavit rule at the summary judgment stage 'must be carefully limited to situations involving *flat contradictions* of material fact'" in order to avoid infringing upon the province of the factfinder. *Mendez v. Nationwide Prop. & Cas. Ins. Co.*, 910 F. Supp. 2d 784, 789 (D. Md. 2012) (emphasis added) (quoting *Mandengue v. ADT Sec. Sys., Inc.*, Civ. No. ELH–09–3103, 2012 WL 892621, at *18 (D. Md. Mar. 14, 2012)). Specifically, the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Mandengue*, 2012 WL 892621, at *18 (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009)). A non-moving party is "not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition," and "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.*

Where, as here, a plaintiff cannot remember a key detail at their deposition but later asserts that they have a specific recollection of that fact in an affidavit, courts have sometimes refused to allow the affidavit to defeat summary judgment. *See, e.g., Yeager v. Bowlin*, 693 F.3d 1076, 1080

14

(9th Cir. 2012) ("Several of our cases indicate that a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember."); *Higgins v. Food Lion, Inc.*, 197 F. Supp. 2d 364, 368 n.4 (D. Md. 2002) ("In opposition to Defendant's summary judgment motion, Plaintiff attached an affidavit, dated the same day as the opposition, in which he asserts that he now has a specific recollection of working off the clock on [those dates]. Based upon the facts of this case, the Court finds that such a recollection, alone, cannot be used to defeat the summary judgment motion, especially where it so clearly contradicts the Plaintiff's deposition testimony."). However, the Ninth Circuit has cautioned that "newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." *Yeager*, 693 F.3d at 1081. Courts must be wary of dismissing such affidavits where "a deponent's memory could credibly have been refreshed by subsequent events, including discussions with others or his review of documents, record, or papers." *Id.*

Patterson argues that Moore's claim that her recollection was refreshed upon seeing Patterson's face at his deposition is "plainly insufficient, as it is nonsensical that, nearly eight (8) months after she filed suit against Deputy Patterson and after the parties had exchanged written discovery, she would not be able to identify whether Deputy Patterson was the law enforcement officer that pointed his firearm at her." ECF 56, at 3. Patterson further notes that his "picture (while he is in uniform) is readily available online," and cites to a Facebook page and news article each featuring Patterson's photo, *see* ECF 56, at 4, though Patterson does not suggest that Moore has seen either photo. Finally, Patterson points out that "[a]lthough Plaintiff was supposedly able to identify Deputy Patterson during his deposition on February 6, 2025, she did not amend her prior testimony until nearly four (4) months later—after the close of discovery and after Deputy Patterson filed his Motion for Summary Judgment." *Id.*

Moore responds in her surreply[11] that Moore had "only seen Deputy Patterson twice in her life, once at the scene of incident and again" at his deposition. ECF 57-1, at 6; *see also* ECF 53-2, at 1 ("I have seen Deputy Patterson twice in my life, first on 9/22/21 when he pointed his gun at me and told me to stay in my vehicle and again on 02/06/25 when Deputy Patterson gave his deposition in this case on Zoom."). Accordingly, she asserts that it is reasonable that viewing Patterson at his deposition, which took place after her deposition, refreshed her memory of his appearance. *See* ECF 57-1, at 6. Moore also asserts that she either had not seen or was not able to discern Patterson's appearance from the pictures available online. *See id.* at 2.

The Court agrees with Moore that her affidavit should not be disregarded. Moore has sufficiently explained that this is a situation where "a deponent's memory could credibly have been refreshed by subsequent events, including discussions with others or [her] review of documents, record, or papers." *Yeager*, 693 F.3d at 1081 (alteration added); *see also Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 28 F. Supp. 3d 465, 484 n.6 (D. Md. 2014) (rejecting the argument that a post-deposition declaration should be disregarded as a "sham affidavit" where a party "could not remember the details of the emails at issue here, yet was able to do so in his recently submitted declaration" because "the deposition occurred over six years after the correspondence in question was written and [the party] was testifying without the aid of the disputed emails" so "the discrepancy [was] adequately explained"), *aff'd*, 885 F.3d 271 (4th Cir.

---

[11] "Though surreplies are generally not permitted, *see* Local Rule 105.2(a), the Court in its discretion may allow a party to file a surreply." *Boland v. Amazon.com Sales, Inc.*, 628 F. Supp. 3d 595, 599 (D. Md. 2022). "This discretion is typically used in the interest of fairness to permit parties to respond to new matters raised for the first time in the opposing parties' reply briefs." *Id.* In this case, Patterson advances a new argument in his reply memorandum that Moore's affidavit is a "sham affidavit." *See* ECF 56, at 2. In the interest of fairness, Moore should be permitted to respond to that new argument. Accordingly, the Court grants Moore's motion for leave to file a surreply, ECF 57.

2018).   Moreover, the end of Patterson's deposition transcript is consistent with Moore's representation that she logged on to the deposition, which was taken on Zoom, for the purposes of viewing Patterson's face and refreshing her memory with respect to Patterson's appearance. *See* ECF 48-4, at 189–90 ("[B]efore we get off, we're going to bring on Ms. Moore, just so she can visually see Mr. Patterson."). Moore's affidavit reflects her ability to place a name to a face after seeing Patterson for the first time since the accident. *See* ECF 53-2, at 1–2. Her statements at the deposition, reflecting a failure of memory prior to seeing Patterson's face again, are not inconsistent with that explanation. Indeed, to the extent Moore attempted to recall physical characteristics of the officer at her deposition, a description she offered—that "[h]e was white"— is vague but nonetheless consistent with a later identification of Patterson. ECF 48-6, at 41. In light of Moore's explanation, the Court concludes that there is no inconsistency so "clear and unambiguous to justify striking the affidavit." *See Mandengue*, 2012 WL 892621, at \*18.

Patterson's countervailing arguments are unpersuasive. Patterson does not suggest that Moore had the opportunity to view his face at length prior to his deposition, but rather asserts that pictures of him were publicly available for review. *See* ECF 56, at 4. However, the Court observes that the two pictures of Patterson he identifies as accessible online are not clear images of Patterson's face. Patterson is masked in the Facebook photo, and thus a significant portion of his face is obscured. *See* Image posted by Federick County Sheriff's Office, MD, Facebook (Jan. 21, 2021), https://perma.cc/S83X-2U9P. Likewise, the image in *The Frederick News-Post* displays Patterson relatively far from the camera, with his head down and wearing sunglasses. *See* Mary Grace Keller, *People with disabilities practice traffic stops with Frederick deputies, nonprofit*, Frederick News-Post (Apr. 22, 2022), https://perma.cc/5D5M-LF4C.

In addition to her affidavit, Moore also asserts that the record contains "circumstantial evidence" that it was Patterson who seized her. *See* ECF 53-1, at 21–22. First, Moore points to the statement she gave to her insurance company, made two days after the accident, in which Moore stated that at least one deputy ran up to her, pointed his gun, and told her to show her hands before ordering her back into her car. *Id.* at 21 (citing ECF 53-4, at 4). Second, she notes that Sergeant Angleberger represents that he and Patterson were the first two deputies on the scene of the accident, and Sergeant Angleberger stated that he did not pull his gun and would have filed a use of force report if he had. *Id.* (citing ECF 48-4, at 13). But Patterson, Moore observes, did file a use of force report. *Id.* (citing ECF 48-11, at 1–2). Moore thus contends that when you combine her testimony, along with testimony that only two deputies were on the scene initially and Sergeant Angleberger did not use his weapon, a reasonable factfinder could conclude that Patterson was the officer who allegedly seized her. *See id.* at 21.

While the Court has an obligation to view all facts and reasonable inferences taken therefrom in the light most favorable to the nonmoving party, "[t]he nonmoving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). "Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Id.* (quoting *Anderson v*, 477 U.S. at 251).

The Court notes that *Machie v. Manger*, which Patterson invokes in support of his position, admittedly bears some resemblance to the circumstances presented here. *See* Civ. No. AW-09-2196, 2013 WL 3353740, (D. Md. July 2, 2013), *aff'd sub nom. Machie v. Demme*, 564 F. App'x

18

17 (4th Cir. 2014). There, the plaintiff brought a Fourth Amendment excessive force claim against defendant police officers arising out of his arrest outside of his apartment. *Id.* at *1. The plaintiff asserted that one of the officers was personally involved in his arrest and relied on the fact that the officer was listed as an arresting officer on a report, filled out the statement of probable cause, and consulted with another officer about the plaintiff prior to the arrest. *See id.* at *5. However, there was "no testimony or evidence in the record suggesting that [the officer] made the ultimate decision to arrest [the plaintiff]." *Id.* Further, the officer provided uncontradicted testimony "that he did not know that [the plaintiff] was going to be arrested until he saw [the plaintiff] in handcuffs." *Id.* The *Machie* Court thus concluded that there was no evidence to support the conclusion that the officer "had any personal involvement in [the plaintiff]'s encounter with police outside of his apartment" other than based on his "status as 'lead investigator,' . . . not on the actions he took in that capacity." *Id.* at *6.

Here, unlike in *Machie*, Plaintiff asserts, under penalty of perjury, that upon seeing Patterson's face at his deposition, she is convinced that he was the officer that came towards her with his gun drawn and ordered her back into her vehicle. ECF 53-2, at 2. Moore's unequivocal assertion is enough to generate a genuine dispute of material fact as to Patterson's personal involvement in Moore's alleged seizure. *See Swink v. S. Health Partners Inc.*, No. 21-2183, 2025 WL 3237254, at *24 n.14 (4th Cir. Nov. 20, 2025) (Richardson, J., concurring in part) ("The deposition testimony alone is sufficient to create a genuine dispute of material fact."); *Merch. v. Fairfax Cnty., Va.*, 778 F. Supp. 2d 636 (E.D. Va. 2011) ("[T]he Fifth Circuit has sensibly noted that circumstantial evidence can provide a genuine basis for a factual dispute even where only one witness offers direct testimony concerning the event . . . ."), *aff'd sub nom. Merch. v. Bauer*, 677 F.3d 656 (4th Cir. 2012); *Mack v. Detyens Shipyards, Inc.*, Civ. No. 2:16-1323-RMG, 2017 WL

5952692, at *3 (D.S.C. Nov. 30, 2017) ("Rather, it is her sworn testimony regarding facts of which she has direct, personal knowledge . . . . If other witnesses dispute her account of the event, that is an issue of credibility issue for a jury to decide."). Accordingly, summary judgment is not warranted in favor of Patterson on this ground alone.

ii.    *Seizure*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 585 (2018). Even assuming Patterson was the officer involved, Patterson argues that Moore's Fourth Amendment claim must fail because "Patterson did not intend to seize her." *See* ECF 48-1, at 20–21. Moore responds that Patterson's intent-focused argument is misplaced, and that "[n]o reasonable citizen would think they were free to leave the scene of that accident with a sheriff's deputy pointing a gun at them and telling them to get back in their car." ECF 53-1, at 18–19. Moore has the better argument.

"A 'seizure,' the Supreme Court recently affirmed, occurs when officers employ 'physical force or a show of authority that in some way restrain[s] the liberty of the person.'" *United States v. Cloud*, 994 F.3d 233, 241–42 (4th Cir. 2021) (internal quotation marks omitted) (quoting *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (alteration in *Torres*)). The key question, then, is whether the officer "made a sufficient 'show of authority' to effectuate such a seizure." *Id.* at 242. "[A] show of authority occurs if the totality of the circumstances demonstrates that a reasonable person, measured objectively from an innocent citizen's perspective, 'would have believed that he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). However, "[t]hat officers employed a show of authority does not alone implicate the

Fourth Amendment"—"[f]or a seizure to occur, the defendant must actually submit to that show of authority." *Id.* (citing *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015)).

The Fourth Circuit has "enumerated six broad, non-exclusive categories of facts that may be relevant" in evaluating whether a reasonable person would have felt free to leave: "(1) how many officers were present; (2) whether officers were in uniform and/*or displayed firearms*; (3) whether any officer touched the defendant or made any attempt to block or restrain his movement; (4) if the officer's questioning was 'conversational rather than intimidating'; (5) whether the officer informed the defendant that he suspected him of illegal activity, or treated the encounter as 'routine'; and (6) if the officer asked for identification, how quickly the officer returned it to the defendant." *Id.* (internal quotation marks omitted) (quoting *United States v. Gray*, 883 F.2d 320, 322–23 (4th Cir. 1989)); *see also United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002) ("In applying the totality of the circumstances test, courts look to numerous factors including . . . *the potential display of a weapon by an officer*[.]" (emphasis added)).

As an initial matter, the Court addresses Patterson's argument that "Patterson did not *intend* to seize her." ECF 48-1, at 20. It is true that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989). However, that does not mean that the officer must have specifically intended to seize Moore. *See id.* ("A seizure occurs even when an unintended person or thing is the object of the detention or taking."). Rather, "the detention or taking itself must be willful," rather than the product of "an unknowing act." *Id.* "Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment." *Id.* "It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement

(the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Id.* at 596–97 (emphasis in original). The means through which Moore asserts the seizure occurred—*i.e.*, the pointing of the firearm and the alleged yelling of commands directly at her, ECF 48-6, at 20–21—were certainly "intentionally applied" to the intended object of application, who, Moore contends, was her. *See Brower*, 489 U.S. at 597. Accordingly, viewing the facts in the light most favorable to Moore, a reasonable factfinder could conclude that Patterson "made a sufficient 'show of authority' to effectuate" the seizure of Moore. *See Cloud*, 994 F.3d at 242.

Moore asserted at her deposition that more than five officers were present on the scene, although she consistently asserts that only one approached her vehicle and ordered her into the car. *See* ECF 48-6, at 22; *see also* ECF 53-4, at 4.[12]   Moreover, Moore's deposition reflects an interaction that could be construed as "intimidating," rather than a "conversational" and routine encounter, *Cloud*, 994 F.3d at 242—specifically, Moore asserts that the officer, whom she has

---

[12] To support the argument that Moore was seized, Moore produces expert testimony from David Sweeney, a former lieutenant of the Seattle Police Department. *See* ECF 53-5. Patterson argues, however, that Sweeney's unsworn expert report is inadmissible at the summary judgment stage. *See* ECF 56, at 5–7. "[I]t is well-established at both the circuit level and in this District that unsworn expert reports are inadmissible on summary judgment." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 660 & n.5 (D. Md. 2013) (collecting cases), *aff'd*, 605 F. App'x 159 (4th Cir. 2015). Sweeney's report is unsworn, and Sweeney did not sign it under penalty of perjury. *See id.* (observing that signing under penalty of perjury may substitute for a sworn declaration pursuant to 28 U.S.C. § 1746). Accordingly, the Court does not consider Sweeney's report, ECF 53-5, in considering whether a seizure was effectuated in this case, or for any other purpose. However, Moore also attaches a deposition of Sweeney, which Sweeney participated in under oath. Patterson does not argue that the deposition should be excluded, and the Court sees no reason to exclude it. Accordingly, the Court has considered the deposition in addressing the motion for summary judgment.

since identified as Patterson, ECF 53-2, at 1, "yelled" at her to get back in the vehicle, and repeated

the phrase, "Let me see your hands," ECF 48-6, at 21. Moreover, Moore states that Patterson's

firearm was drawn, *id.* at 41, a factor weighing in favor of a seizure having occurred. *See Weaver*,

282 F.3d at 310. Reviewing the totality of the circumstances as presented in this factual record,

the Court thus holds that a reasonable factfinder could conclude that Moore did not feel free to

leave during the interaction she alleges, and that she submitted to Patterson's alleged show of force

by remaining in her vehicle for a period of time.

To be sure, had Moore alleged that she was somehow accidentally seized by Patterson as

he attempted to seize his intended target, the outcome may be different since a Fourth Amendment

seizure only occurs "when a governmental actor acts with the intention of seizing the particular

individual at issue [and] accidental or unintended seizures do not fall under the Fourth

Amendment." *Lopez v. City of Santa Maria*, No. CV13-7287 AJW, 2016 WL 316004, at *3 (C.D.

Cal. Jan. 26, 2016) (citations omitted). As the Fourth Circuit made clear in *Rucker*:

> A [F]ourth [A]mendment seizure may occur notwithstanding that the person
> restrained was mistakenly thought to be another, because he nevertheless is the
> intended object of the specific act of physical restraint. But it does not mean, as [the
> plaintiff in *Rucker*] contend[ed], that a seizure occurs just so long as the act of
> restraint itself is intended . . . though it restrains one not intended to be restrained.

946 F.2d 278, 281 (4th Cir. 1991). Thus, an innocent bystander who was accidentally shot by

police was not "'seized' within contemplation of the Fourth Amendment" because it was

"undisputed on the summary judgment record that [the bystander] was not the intended object of

the shooting by which he was injured." *Id.* at 281. Thus, if Moore contended that she was seized

because of her response to an unholstered firearm in the hands of an officer running by in pursuit

of a fleeing suspect, the Court might agree that deputies could not be held liable under the

principles outlined in *Rucker* and *Brower*. However, Moore states in her affidavit that "Patterson

pointed his gun *at her* and *ordered her* to get back in her vehicle." ECF 53-1, at 16 (emphasis added) (citing ECF 53-2, at 1-2). Thus, the Court reiterates that summary judgment is not warranted on the ground that "Deputy Patterson did not intend to seize her." ECF 48-1, at 14.

Stated plainly, there is ample evidence in the record for a factfinder to agree that Moore was intentionally seized when an officer pointed a firearm at her and ordered her to remain in her car, if even briefly. Moreover, there is evidence in the record that could lead a factfinder to conclude that the officer who did so was Patterson. Thus, the Court will assume Moore was seized by Patterson and proceed to analysis of whether that seizure was reasonable.

### iii.    Reasonableness

At the outset, the Court again notes that Moore cabins her argument solely to the question of whether an officer she identifies as Patterson acted unlawfully in ordering her to briefly remain in her car while he called for paramedics and pursued a fleeing suspect. *See supra* note 7. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Moretti v. Thorsdottir*, 157 F.4th 352, 360 (4th Cir. 2025) (emphasis omitted) (quoting *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996); *see also United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013) ("As a general rule, 'an official seizure of the person must be supported by probable cause, even if no formal arrest is made.'" (quoting *Michigan v. Summers*, 452 U.S. 692, 696 (1981))). "The government bears the burden of demonstrating that a warrantless seizure is reasonable." *Id.* Patterson appears to concede that the alleged seizure of Moore was not supported by probable cause, arguing instead that probable cause was not required to meet the Fourth Amendment's general reasonableness standard.[13] *See* ECF 56, at 7–8.

---

[13] Even if Patterson had not effectively conceded this point, the Court would nevertheless conclude that the record does not establish that any officer had probable cause to seize Moore. "Probable

"In analyzing the reasonableness of a seizure that is not supported by probable cause, courts are required to evaluate 'the law enforcement interest and the nature of the articulable facts supporting the detention.'" *Watson*, 703 F.3d at 689–90 (internal quotation marks omitted) (quoting *Summers*, 452 U.S. at 702). Such an intrusion "must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Id.* at 693 (quoting *Terry v. Ohio*, 392 U.S. 1, 26 (1968)). The "analysis entails a balancing test because, under the Fourth Amendment, 'reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Id.* at 690; *see also United States v. Stanfield*, 109 F.3d 976, 979 (4th Cir. 1997). Accordingly, the Court must balance the intrusion on Moore's Fourth Amendment interests against the promotion of the legitimate governmental interests implicated here. *See id.* (citing *Maryland v. Buie*, 494 U.S. 325, 331 (1990)).

Starting with the governmental interest, the Court observes that law enforcement had a significant interest in attempting to control the scene of an accident in the aftermath of a high-speed pursuit of a suspected stolen vehicle. The Fourth Circuit has acknowledged "that 'traffic stops alone are inherently dangerous for police officers.'" *Nazario v. Gutierrez*, 103 F.4th 213,

---

cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Id.* (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)). "The probable-cause inquiry turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Id.* (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). Here, Patterson would have known nothing about Moore's conduct before he allegedly approached her with his firearm drawn, other than the clear fact that her car had just been hit by the fleeing suspects' vehicle. Moreover, Moore bore no resemblance to the men that Patterson was chasing. *See* ECF 53-1, at 20; ECF 48-4, at 177 (in response to the question of whether Patterson "identif[ied] a black African American woman as someone [he was] pursing," he answered "No"). Thus, there was not enough information for a reasonable or prudent officer to believe there was probable cause that Moore committed the offenses at hand (or any offense).

233 (4th Cir. 2024) (quoting *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (en banc)). Thus, "[i]t is well established that officers performing a lawful stop are authorized to take such steps as are reasonably necessary to protect their personal safety thereafter." *Id.* (alteration in *Nazario*) (quoting *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007)). When a "driver suddenly pulls away in the midst of a stop, the risks multiply." *Barnes v. Felix*, 605 U.S. 73, 86 (2025) (Kavanaugh, J., concurring). Specifically, the risks multiply for civilians driving and walking in the public thoroughfares through which the police chase ensues, in addition to the officers involved in the chase. And as the Supreme Court has stated in the context of a case with a car chase at its center, the "governmental interest in ensuring public safety" is "paramount." *Scott v. Harris*, 550 U.S. 372, 383 (2007); *see also Myers v. Town of Elkton*, 745 F. Supp. 3d 219, 239 (D. Md. 2024) ("The governmental interests alleged to justify the seizure—protecting individuals, including law enforcement officers, from imminent danger of physical harm—is also strong." (citing *Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020)).

It is also important to reiterate that "[t]he touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Samson v. California*, 547 U.S. 843, 855 n.4 (2006). "Thus, while [the Supreme Court's] jurisprudence has often recognized that 'to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure,' [the] Fourth Amendment imposes no irreducible requirement of such suspicion.'" *Id.* (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 560–61 (1976)). For example, the "detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion" is "reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search." *Bailey v. United States*, 568 U.S. 186, 191 (2013) (citing *Summers*, 452 U.S. at 692). With a focus on officer safety, courts

have extended the rationale cited in *Summers* to cover a wide variety of scenarios, including endorsing the seizure of an innocent bystander who was "truly in the wrong place at the wrong time" while police sought to arrest a fugitive on a warrant lawful despite the fact that the innocent bystander was ordered to "show his hands." *United States v. Enslin*, 327 F.3d 788, 791 (9th Cir. 2003); *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1191 (3d Cir. 1995) (finding the "need to ascertain [the plaintiffs'] identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable" for officers to order uninvolved bystanders entering an apartment that was about to be searched to "'get down,' until the situation was under control"). The same rationale should control where police momentarily detained a bystander to ensure her safety, and theirs.

Here, a seemingly lawful car stop[14] transformed into a chase that put bystanders at significant risk, as evidenced by the harm suffered by Moore when the Infiniti crashed into her vehicle. Although the suspected crime justifying the stop was nonviolent, and though Patterson

---

[14] Moore does not argue that Patterson was not legally justified in initially stopping the Infiniti after he identified the license plate as stolen. *See generally* ECF 53. Moreover, to the extent Moore seeks to raise a Fourth Amendment challenge to Patterson's earlier seizure of the Infiniti's occupants, she does not have standing to do so. "To have Fourth Amendment standing, a Plaintiff must show that 'the disputed search and seizure has infringed an interest of the [Plaintiff's] which the Fourth Amendment was designed to protect.'" *Antunes v. Rector & Visitors of Univ. of Va.*, 627 F. Supp. 3d 553, 565 (W.D. Va. 2022) (alterations in *Antunes*) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)), *aff'd sub nom. Antunes v. Becerra*, No. 22-2190, 2024 WL 511038 (4th Cir. Feb. 9, 2024). "One who asserts a Fourth Amendment violation bears the burden of demonstrating that his own Fourth Amendment rights, rather than those of someone else, were violated." *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012), *aff'd*, No. 12-5328, 2013 WL 1164502 (D.C. Cir. Feb. 20, 2013). "Fourth Amendment rights are personal and may not be 'vicariously asserted.'" *Id.* (quoting *Rakas*, 439 U.S. at 133–34). Moore has not invoked any precedent supporting the proposition that she has standing under the Fourth Amendment to challenge the prior stop of the occupants of the Infiniti. *See Davis v. Twp. of Hillside*, 190 F.3d 167, 169 n.1 (3d Cir. 1999) ("Even if the use of a police car to stop Cook's flight could be found to be a Fourth Amendment seizure, the claim would be personal to Cook and could not be asserted by a bystander such as plaintiff." (internal citations omitted)).

never observed that the suspects in the Infiniti had weapons, the Infiniti's flight in the midst of moderate traffic posed a serious risk to the public and demonstrated that the driver of the Infiniti was willing to take dangerous risks to avoid capture by law enforcement. *Cf. Scott*, 550 U.S. at 384 ("Although there is no obvious way to quantify the risks on either side, it is clear from the videotape that respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase."). Moreover, at the time Moore alleges she was seized, a passenger had fled the crashed vehicle and was not yet identified or apprehended by law enforcement. *See* ECF 48-4, at 166; ECF 48-6, at 20–21. Accordingly, at the time of her seizure, it was critical that bystanders like Moore stayed safely in their cars while police addressed any possible threat posed, at minimum, by the occupants of the Infiniti.

Further, even viewing the record in the light most favorable to Moore, her alleged seizure was short in duration. Moore's deposition testimony describes a short exchange of words between her and Patterson, which ended with Patterson telling Moore to "get back into the car" and calling the paramedics to assist her. *See* ECF 48-6, at 19–22. Although Moore was not able to recall the exact length of time of the interaction, Moore makes no assertion that the officer she identifies as Patterson continued to point a firearm at her after she clarified that she was an injured victim. *Id.* at 120.

Of course, Moore's assertion that a firearm was pointed at her for *any* length of time means that she incurred *some* risk of serious injury or death, as is always the case when a loaded weapon is pointed at one's person. This was no doubt a frightening, jarring event and one that constitutes a seizure under the Fourth Amendment. *See Nicholson*, 2023 WL 4549741, at *5 ("Assuming the sequence of events happened as previously described—Defendant identified himself as police,

28

pulled out his weapon, and directed Plaintiff to leave—a reasonable person under those circumstances would not have felt 'free to terminate the encounter' once the gun was pulled out."). But the Court is mindful of the fact "that 'police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving'" and the Court must "consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.'" *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir.2002) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, at least in the context of claims of excessive force, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," represents a violation of the Fourth Amendment. *Graham*, 490 U.S. at 396. The same is true here where deputies were responding to a fleeing vehicle where the driver and passenger's "behavior indicated to the officers a good chance that [they] would not cooperate in the arrest without application of some force and that it was difficult to predict how [they] would react to their orders." *Whitebey v. Sarrge*, No. 7:11CV00105, 2011 WL 6323134, at *11 (W.D. Va. Dec. 16, 2011). Thus, the Court concludes that the momentary seizure of Moore as police dealt with the chaotic aftermath of an accident and at least one fleeing suspect does not violate the Fourth Amendment.

As this Court recently observed in the related context of the warrantless seizure of property, "government interests will only overcome the presumptive unreasonableness of the seizure in the context of summary judgment if there is no genuine dispute as to the existence and degree of [the] danger" officers faced. *Myers*, 745 F. Supp. 3d at 239. The evidence here paints an undistorted picture of an objectively chaotic, and potentially dangerous, situation. Moore emphasizes that the initial violation which led Patterson to stop the Infiniti—the stolen tag—was "a minor misdemeanor" and that the occupants had showed "no aggression to that point." *See* ECF 53-1, at

14. While this is a technically true statement, it ignores what happened next; the vehicle fled at a high rate of speed, crashed, and an occupant fled the vehicle. Sweeney, Moore's proposed expert, also stated in his deposition that Moore was not doing anything "that should have caused [officers] to fear for their safety." ECF 53-6, at 18, 69:4–16. This is also true, but ignores the fact that it wasn't just Moore that Patterson (and other officers) had to contend with as the driver of the Infiniti remained in a nearby car, other cars were involved in the accident, and a passenger was fleeing the Infiniti. These exigent circumstances marked the moments following the crash while Patterson and other deputies attempted to apprehend a fleeing suspect.

Sweeney also offers that the "stolen tag and a vehicle that fled at high speed" do not create enough of an exigency "to draw [a] weapon," and although there was a "passenger that escaped," there was "no evidence that the passenger engaged in any criminal activity." ECF 53-6, at 23, 89:1–90:3 (deposition of Sweeney); *see also id.* at 90:12–92:4. Putting aside the fact that the focus on the use of the weapon misconstrues Moore's claim as one alleging excessive force, not, as she describes it, assessing whether her temporary seizure was lawful, the Court cannot find fault with the decision to pursue the fleeing passenger who bailed out of the wrecked Infiniti. "Although flight alone is not enough to justify a police stop, this is not a case of flight upon noticing police." *United States v. Bonner*, 363 F.3d 213, 215 (3d Cir. 2004). It is beyond debate that "[d]uring a traffic stop, police officers may exercise reasonable superintendence over the vehicle, its driver, and passengers." *Id.* Accordingly, "[f]light from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion." *Id.* In fact, courts have found no error in the forceful detention of passengers who *remain* at the scene of a traffic stop. *See United States v. Persinger*, 284 F. App'x 885, 889 (3d Cir. 2008) (finding it reasonable to place the passenger of a vehicle that

fled a traffic stop face down on the pavement "following a vehicle chase in which the offending vehicle collided with several cars before crashing to a stop"); *see also United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (noting that because "passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well" (citing *Maryland v. Wilson*, 519 U.S. 408, 413–14 (1997))). Given that it is uncontested that the passenger here emerged—and ran—from a vehicle that tried to elude police, at a high rate of speed, and caused a major accident, the Court finds no fault with the decision to pursue the passenger.

The Court is also mindful of the fact that though Moore understandably wanted to escape the situation, leave her car, and "get home to [her] family," ECF 48-6, at 123, she arguably was not permitted to do so under Maryland Law. Under multiple provisions of the Maryland Code, individuals involved in traffic accidents are not permitted to leave the scene of the accident. *See, e.g.*, Md. Code Ann., Transp. § 20-102(a)(1) ("The driver of each vehicle involved in an accident that results in bodily injury to another person immediately shall stop the vehicle as close as possible to the scene of the accident[.]"); *id.* § 20-103(a) ("The driver of each vehicle involved in an accident that results only in damage to an attended vehicle or other attended property immediately shall stop the vehicle as close as possible to the scene of the accident, without obstructing traffic more than necessary."). The Court cannot find it unreasonable to compel Moore to remain at the scene when she was otherwise compelled to do so under applicable law.

Patterson also invokes two Fourth Amendment excessive force cases from the Fourth Circuit that suggest his behavior comported with existing Fourth Amendment law. *See* ECF 48-1, at 22 – 24 (citing *Unus v. Kane*, 565 F.3d 103 (4th Cir. 2009) and *Bellotte v. Edwards*, 629 F.3d

415, 418 (4th Cir. 2011)).[15]  A review of the cases Patterson cites only bolsters the Court's

conclusion that the brief detention at issue here was reasonable. In *Unus v. Kane*, agents executing

a search warrant seeking financial records entered a residence with firearms drawn, broke down

the door, pointed guns at occupants, and handcuffed seemingly uninvolved family members of the

target of the investigation. 565 F.3d 103, 110 (4th Cir. 2009). Applying the Virginia

Constitution's reasonableness requirement, the Fourth Circuit concluded that "the pointing of

firearms at the plaintiffs upon entry into the [] residence was reasonable under the circumstances."

*Id.* at 118. Specifically, the court pointed out that the occupants had failed to "permit the officers

to enter in accordance with the Warrant" and once the officers entered, they "immediately

encountered two persons unknown to them, one of whom was on a telephone." *Id.* In such

circumstances, the Fourth Circuit reasoned that "the officers were reasonably entitled to believe

that the drawing of weapons was necessary in order to gain control of a fluid situation and ensure

the safety of all involved." *Id.* at 118.

In *Bellotte v. Edwards*, officers secured a warrant to search a suspect's home after it was

alleged that the suspect had visited a self-service photo kiosk at Wal-Mart and printed a photo

possibly depicting child pornography. 629 F.3d 415, 418 (4th Cir. 2011). The appellate court was

ultimately tasked with addressing both the reasonableness of the decisions to execute a "no-knock

---

[15] Moore, however, notes that these cases involve excessive force allegations and argues that they are ill-suited to address her unlawful seizure claim. *See* ECF 53, at 24–25 ("The excessive force test has nothing to do with this case . . . no amount of force is permitted to be used when the seizure is unlawful to start with so *Bellotte* is irrelevant."). Patterson replies that courts frequently assess the reasonableness of a seizure by relying on principles espoused in excessive force cases. *See* ECF 56, at 11 (citing *Covington v. Plymouth Twp. Police Department*, 779 F. Supp. 3d 509, 528 (E.D. Pa. 2025), where the trial court concluded that a jury could find a plaintiff's seizure to be unreasonable by relying in part on "cases where courts have assessed the reasonableness of officers detaining bystanders during the execution of a warrant" even though those cases were "not directly on point"). The Court agrees that the cases provided by Patterson are helpful to the general reasonableness inquiry that must be conducted here.

entry" into the home and, relevant to the case at bar, the decision to enter the "home and [a plaintiff's] bedroom in dramatic fashion with guns . . . drawn." *Id.* at 425. Though finding fault with the decision to execute the warrant without knocking and announcing their presence, *id.* at 421, the Court found that the officers were entitled to qualified immunity for their decision to enter the home with their weapons drawn, *id.* at 425. Prior to the search, officers had learned that the target of the search and his spouse had concealed carry permits. *Id.* at 423. Drawing on *Unus*, the Fourth Circuit held that the officers acted in response to a real "risk to their safety" *Id.* at 425. Indeed, when one of the occupants "reached for a gun with the intention to shoot," officers "wrest[led] her to the ground" and "did not "touch[] her with a weapon or threat[en] to use a weapon against her." *Id.* Since officers acted reasonably in drawing (and handling) their weapons, the Fourth Circuit held that they were entitled to qualified immunity. The appellate court even extended this immunity to cover officers' actions toward a "twelve-year-old" occupant of the home, who awoke to the sight of several officers "standing at the foot of her bed with flashing lights and guns pointed at her." *Id.* at 426. "[O]fficers," the Fourth Circuit noted, "had good reason to fear for their own safety upon entering [the child's] unsecured room" under the circumstances. *Id.* at 426. Moreover, "[t]here [was] no evidence that the officers who entered [her] room kept their weapons drawn after they realized who she was." *Id.*

*Unus* and *Bellotte* obviously present facts that are only marginally analogous to what Moore experienced here. However, each provides an example of binding authority finding no fault with police officers who draw their firearms and momentarily seize innocent bystanders during hectic and quickly evolving situations. Given that the chaotic aftermath of the high-speed car chase and accident here presented a reasonable threat to their safety, officers were justified in drawing their firearms and ordering those involved, like Moore, to remain in their cars.

33

> iv.    *Qualified Immunity*

Even if the Court concluded that Patterson acted objectively unreasonably as a matter of

law under the Fourth Amendment, he would nonetheless be entitled to qualified immunity on

Plaintiff's Fourth Amendment claim.  Under the doctrine of qualified immunity, "government

officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The doctrine protects "all but the plainly incompetent or those who knowingly violate the law."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986). ."[O]fficers are entitled to qualified immunity under

§ 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness

of their conduct was 'clearly established at the time.'" *Wesby*, 583 U.S. at 62–63 (quoting *Reichle*

*v. Howards*, 566 U.S. 658, 664 (2012)).  Both prongs must be answered in the affirmative to defeat

a motion for summary judgment on qualified immunity grounds. *Dobbs v. Townsend*, 416 F. Supp.

3d 441, 451 (D. Md. 2019) (citing *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007)).

"In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense.

The plaintiff bears the burden on the first prong, and the officer bears the burden on the second

prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).  "Ordinarily, the question of qualified

immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d

553, 558–59 (4th Cir. 2005).  Further, because qualified immunity is in part designed "to protect

public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective

government,'" the Supreme Court "has emphasized that qualified immunity questions should be

resolved at the earliest possible stage of litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6

(1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982)).

34

Disputed factual issues may preclude such a determination. *See, e.g., Burno-Whalen v. Maryland*, Civ. No. GJH-15-564, 2016 WL 1259556, at *5 (D. Md. Mar. 28, 2016) ("[D]isputes of material fact may preclude a finding by the Court about whether qualified immunity applies, and instead convert the inquiry into a question for the trier of fact."); *Gray v. Torres*, Civ. No. WDQ-08-1380, 2009 WL 2169044, at *2 (D. Md. July 17, 2009) (noting that, in the summary judgment context, "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of [a defendant's] conduct" and therefore the summary judgment doctrine should not be "skewed from its ordinary operation to give substantive favor to the defense" (citations omitted)); *Raub v. Bowen*, 960 F. Supp. 2d 602, 608 n.8 (E.D. Va. 2013) ("So long as qualified immunity does not turn on *disputed facts*, 'whether the officer's actions were reasonable is a question of pure law.'" (emphasis in original) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc))). Plus, the Fourth Circuit has unambiguously noted that in the context of § 1983 claim premised on a Fourth Amendment challenge, "[w]hen there is no dispute about the historical facts—the who, what, where and when of what happened—the objective reasonableness of officers' conduct is a matter of law to be decided by the court." *Armstrong v. Hutcheson*, 80 F.4th 508, 513 (4th Cir. 2023). Here, the only apparent disputes of material fact are settled for purposes of addressing the pending motion since the Court assumes that Patterson was the officer involved and that all events unfolded as Moore alleges. The issue of qualified immunity is thus a pure question of law appropriate to assess at this stage of litigation. *See Raub*, 960 F. Supp. 2d at 608 n.8.

Because the Court has determined that Moore's constitutional rights were not violated, Patterson's claim of qualified immunity succeeds on the first prong. *Wesby*, 583 U.S. at 62–63. However, qualified-immunity analysis can move froward in any sequence as the Supreme Court

has held that "[t]he judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Court finds it appropriate under the circumstances present here to address both prongs and finds that Patterson prevails as to the second prong of the qualified immunity analysis as well.

"To determine whether a right is clearly established, [the Court must] assess whether the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 221 (4th Cir. 2018) (alteration added) (citing *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)). "A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Id.* (citations omitted). However, courts are "not to define clearly established law at a high level of generality," as "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal citations omitted). "Defining the right at a high level of generality 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (citing *Wesby*, 583 U.S. at 63) (alteration in *Atkinson*). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 566 U.S. at 664 (internal quotation marks omitted). However, "although we must avoid ambushing government officials with liability for good-faith mistakes made at the unsettled peripheries of the law, we need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019).

Here, it is especially important to note that an officer merely "'[p]ointing a gun' encompasses far too great a variety of behaviors and situations." *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). Focusing on Patterson's actions on September 22, 2021,[16] the Court has not identified a case—in this Circuit or beyond—clearly establishing that Patterson violated the Fourth Amendment by acting as Moore contends he did. Accepting Moore's facts as true, Patterson attempted to control the scene of an accident involving suspects who fled a traffic stop (and one who was fleeing the subsequent crash) by ordering others involved in the accident to remain in their vehicles and show their hands. Moore points to no case where actions like Patterson's, even assuming he briefly pointed a weapon at Moore, were found to run afoul of the Fourth Amendment. Neither has the Court identified case law which would allow an officer to conclude that such behavior violated the law through "drawing logical inferences, reasoning by analogy, or exercising common sense." *See Williams*, 917 F.3d at 770. To the contrary, a review of relevant caselaw "reinforce[s a] critical point: while police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there is reason to fear danger." *Baird*, 576 F.3d at 345.

Indeed, relevant precedent goes in the other direction as the Fourth Circuit recently held that a police officer's conduct "did not violate a clearly established constitutional right" where the

---

[16] Moore views the alleged Fourth Amendment violation in the most general of terms by alleging that qualified immunity is inappropriate because "[t]o be free from unreasonable seizure is a right as old as the constitution itself." ECF 53-1, at 23. Moore goes on to claim that "[t]here are many cases in both the Supreme Court and federal appellate courts, dating back hundreds of years, that stand for the proposition that you cannot legally seize someone who you do not suspect of committing a crime." *Id.* This broad statement is, of course, true, but ignores that the reasonable standard is a dynamic one and seemingly forgets that the Court is not permitted to define the specific contours of Fourth Amendment reasonableness at "a high level of generality." *Atkinson*, 100 F.4th at 505.

officer had drawn his service pistol at an otherwise routine traffic stop and pointed it at the driver

of the vehicle for over a minute. *Nazario*, 103 F.4th at 223, 232–33. If holding an individual at

prolonged gunpoint in circumstances which involved significantly less exigency than those here

does not violate clearly established law,[17] then the Court cannot find that Patterson did so. Had

Moore alleged that Patterson pointed the firearm at her for a longer duration, yelled threatening

commands implying that he intended to use the firearm, or had Moore been a child, the Court notes

that the qualified immunity inquiry may be resolved differently. *See, e.g.*, *Baird*, 576 F.3d at 346

(noting that cases finding the pointing of a firearm at innocent bystanders to be unreasonable under

the Fourth Amendment "often involve children because they are much less likely to present the

police with a credible threat"); *Nazario*, 103 F.4th at 232 (noting the "importance" of the fact that

"the pointing of firearms at [the motorist] by the Policemen was unreasonably exacerbated by the

verbal death threats made" by the defendant officer). Here, even viewing the facts in the light

most favorable to Moore, Patterson was faced with a fluid situation and was permitted to take steps·

reasonably necessary to protect himself and others, including the drawing of a weapon that he

briefly pointed at Moore as she attempted to exit her car. Patterson is thus entitled to qualified

immunity and summary judgment on Moore's Fourth Amendment claim.

### 2.    Fourteenth Amendment

It is unclear whether Moore's amended complaint alleges a § 1983 claim pursuant to the

Fourteenth Amendment for "deprivation of liberty without due process of the law," or whether she.

---

[17] The *Nazario* majority did, however, conclude that officers who pointed firearms and shouted inconsistent commands at a motorist during a traffic stop were not "justified in either threatening or using deadly force" under the circumstances present there. 103 F.4th at 232. To the extent the facts present in *Nazario* can even be analogized to Moore's experience, that decision was handed· down years after the encounter at issue here and thus the alleged "unlawfulness of their conduct" was not "'clearly established at the time'" of the encounter with Moore. *Wesby*, 583 U.S. at 62–63 (quoting *Reichle*, 566 U.S. at 664) (emphasis added).

invokes the Fourteenth Amendment only insofar as it makes applicable the Fourth Amendment against the states. *See* ECF 27-1, at 8 ¶ 39; *Marshall v. Town of Bladensburg*, Civ. No. DKC 24-1549, 2025 WL 822936, at *4 n.3 (D. Md. Mar. 14, 2025) ("The Fourth Amendment is applicable to the states through the Fourteenth Amendment's Due Process Clause." (citing *Mapp v. Ohio*, 367 U.S. 643, 654–56 (1961))). Patterson argues that this claim fails because (1) "Moore's allegations sound in the Fourth Amendment" and (2) because "Moore failed to adduce any evidence that the unidentified law enforcement officer's actions 'shock the conscience.'" ECF 48-1, at 25–26. Moore's opposition fails to address these arguments at length and instead primarily focuses on defending her Fourth Amendment claim. In fact, Plaintiff observes that "Defendant's focus on legal standards involving conduct 'that shocks the conscience' . . . has nothing to do with this case." ECF 53, at 3 ¶ 9. Moore states in her opposition that she will "defer to the court on the disposition of her 14th Amendment . . . claim[] and makes no argument either way about the sufficiency of th[at] claim[]." *Id.* at ¶ 12 (alterations added); *see also* ECF 53-1, at 36.

"A plaintiff's failure to respond to a summary judgment motion may constitute a waiver or abandonment of a claim." *Bell v. Univ. of Md. Coll. Park Campus Facilities Mgmt.*, Civ. No. PX-17-1655, 2020 WL 978659, at *3 (D. Md. Feb. 28, 2020) (quoting *Estate of Edgerton v. UPI Holdings, Inc.*, Civ. No. CCB–09–1825, 2011 WL 6837560, at *4 (D. Md. Dec. 28, 2011)) (collecting cases). Because Moore has decided not to defend her suit insofar as it seeks to assert a Fourteenth Amendment violation against Patterson, despite Patterson's arguments related to that claim in his motion for summary judgment, the Court concludes that Moore has waived her Fourteenth Amendment claims. Further, the Court agrees with Patterson that Moore's § 1983 claim primarily sounds in the Fourth Amendment, as is further evidenced by the content of Moore's opposition. *See* ECF 27, at 8–10; ECF 53-1, at 13–25 ("In this case the rights that were

violated were Mrs. Moore's 4th Amendment Rights not to be seized without probable cause and her analogous rights under Article 26 of the Maryland Declaration of Rights.").

Additionally, even if Moore had brought a Fourteenth Amendment claim, the Supreme Court has explained that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Relevant here, "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Id.* at 274. Thus, Moore's unlawful seizure § 1983 claim is appropriately brought under the Fourth Amendment.

Even if the Court were to consider a substantive due process claim here, it would fail. Although "[s]ubstantive due process violations are actionable under § 1983," *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 300 (D. Md. 2020), "only the most egregious official conduct can be said to be arbitrary in the constitutional sense, such that a substantive due process violation lies." *Id.* (internal quotation marks omitted) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *see also Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991) (explaining that "the substantive protections of the due process clause" may extend to "unintentionally injured 'bystanders'" where "the state actor's conduct . . . amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience" (internal quotation marks and citation omitted)). "Specifically, the Supreme Court [has] reaffirmed that only official conduct that 'shocks the conscience' will give rise to a substantive due process violation." *Id.* (quoting *Lewis*, 523 U.S. at 846–47). "[C]onduct intended to injure in some way unjustifiable by any government

interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*,

523 U.S. at 848 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Even assuming Patterson

briefly pointed his gun at Moore and ordered her into her vehicle for some brief period of time,

such conduct falls well short of "the conscience-shocking level." *See id.*[18] Patterson is entitled to

summary judgment on Moore's Fourteenth Amendment claim, to the extent she even maintains

one.

### B.     Maryland Declaration of Rights Claim (Count I)

Moore also brings claims under "Articles 24 and 26 of the Maryland Declaration of

Rights." ECF 27, at 7–8 ¶¶ 33, 36. Articles 24 and 26 are the state constitutional counterparts to

the Fourteenth and Fourth Amendments, respectively. *See Harried v. Maryland*, Civ. No. TDC-

24-1190, 2024 WL 4817107, at \*7 (D. Md. Nov. 18, 2024) ("The Maryland Supreme Court has

recognized that Article 26 is construed *in pari materia* with the Fourth Amendment while Article

24 is construed *in pari materia* with Due Process Clause of the Fourteenth Amendment.").

Article 24 of the Maryland Declaration of Rights, titled "Due Process," "holds '[t]hat no

man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or

outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but

by the judgment of his peers, or by the Law of the land.'" *Graham v. Maryland*, 738 F. Supp. 3d

644, 653 (D. Md. 2024) (quoting Md. Const., Decl. of Rts., art. 24). "Although the Maryland

Constitution does not contain an express guarantee of equal protection of the laws, it is well

---

[18] To the extent Moore tries to connect her Fourteenth Amendment claim to the car chase which ultimately gave rise to her seizure, the Court observes that the pursuit itself also fails to rise to the shock-the-conscience standard of the Fourteenth Amendment's substantive due process component. *See Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 723 (4th Cir.1991) (holding that a car chase by a police officer that "continued for a significant period of time over a ten mile area" at a "very high rate of speed" and "initiated because of a minor violation" was "disturbing and lacking in judgment" but "did not rise to the level of a violation of substantive due process cognizable under a section 1983 claim").

established that Article 24 embodies the same equal protection concepts found in the Fourteenth Amendment to the U.S. Constitution." *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 971 A.2d 975, 982 (Md. App. 2009) (quoting *Verzi v. Balt. Cnty.*, 635 A.2d 967, 969–70 (Md. 1994)). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496 (D. Md. 2013), *aff'd sub nom. In re Canarte*, 558 F. App'x 327 (4th Cir. 2014) (citation omitted).

Article 26 of the Maryland Declaration of Rights, titled "Warrants for search and seizure," provides that "all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." *Harried*, 2024 WL 4817107, at *7 (quoting Md. Const., Decl. of Rts., art. 26). Although its wording departs from the Fourth Amendment, "Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution." *Ross v. Early*, 899 F. Supp. 2d 415, 431 (D. Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014) (citing *Barnes v. Montgomery Cnty.*, 798 F. Supp. 2d 688, 700 (D. Md. 2011)). "As such, the disposition of [Moore's] § 1983 claim based on an alleged Fourth Amendment violation dictates the same result on [her] Article 26 claim." *See id.*

For the reasons articulated above with respect to Moore's Fourteenth Amendment claim, Patterson is likewise entitled to summary judgment on Moore's Article 24 claim. Moore similarly does not defend her Article 24 claim in the face of Patterson's arguments for summary judgment, thus the Court considers Moore to have waived that claim. *See Bell*, 2020 WL 978659, at *3 ("A plaintiff's failure to respond to a summary judgment motion may constitute a waiver or abandonment of a claim." (citation omitted)). However, the conclusion as to qualified immunity

for Patterson on Moore's Fourth Amendment claim is not applicable to his state constitutional claim. *See Brooks v. McKimmie*, Civ. No. DLB-23-0208, 2025 WL 1018882, at *5 (D. Md. Apr. 4, 2025). Accordingly, the Court turns to Patterson's arguments regarding immunity under the Maryland Tort Claims Act ("MTCA") for this constitutional tort and the other state law torts alleged next.

### C.    Maryland Tort Claims

#### 1.    Notice Provision of the MTCA

As a threshold matter, Patterson argues that Moore "failed to comply with the notice requirement of the Maryland Tort Claims Act." ECF 48-1, at 31. "Under the MTCA, '[a] plaintiff may assert a common law or state constitutional tort claim against the State of Maryland or one of its agencies only if he first complies with the notice requirements of the [statute], which provides a limited waiver of state sovereign immunity.'" *Canter v. Mamboob*, Civ. No. GJH-17-908, 2020 WL 1331894, at *17 (D. Md. Mar. 23, 2020) (quoting *Taylor v. Somerset Cnty. Comm'rs*, Civ. No. RDB-16-0338, 2016 WL 3906641, at *5 (D. Md. July 19, 2016)). "Under Maryland law, sheriffs and deputy sheriffs are considered employees of the state." *McGrath-Malott v. Maryland*, Civ. No. RDB-06-879, 2007 WL 609909, at *4 (D. Md. Feb. 23, 2007); *see also Brooks v. St. Charles Hotel Operating, LLC.*, Civ. No. DLB-23-0208, 2023 WL 6244612, at *8 (D. Md. Sept. 26, 2023) ("But for law enforcement matters in general . . . sheriffs are considered state employees.").

With a few exceptions inapplicable here, a plaintiff may not institute such an action unless (1) the plaintiff "submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;" (2) "the Treasurer or designee denies the claim finally; and" (3) "the action is filed within 3 years after the cause of action arises." Md. Code Ann., State Gov't ("SG") § 12-106(b); *see also McDaniel v. Maryland*,

Civ. No. RDB-10-00189, 2010 WL 3260007, at *3 (D. Md. Aug. 18, 2010) (citing *Gray v. Maryland*, 228 F. Supp. 2d 628, 640–41 (D. Md. 2002)). This requirement "affords the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time." *Haupt v. State*, 667 A.2d 179, 183 (Md. 1995).

However, "this Court has recognized two corollary principles softening strict compliance with the MTCA's notice provisions." *Andrews v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. 1:23-CV-00172-JMC, 2024 WL 520038, at *9 (D. Md. Feb. 9, 2024). "First, 'the Maryland General Assembly amended the MTCA in 2015 to permit substantial compliance . . . [which] entails a communication that provides the State requisite and timely notice of facts and circumstances giving rise to the claim.'" *Id.* (quoting *McDaniel*, 2010 WL 3260007, at *3). Specifically, the MTCA provides that "[i]f a claimant fails to submit a written claim . . . , on motion by a claimant and for good cause shown, the court may entertain an action under this subtitle unless the State can affirmatively show that its defense has been prejudiced by the claimant's failure to submit the claim." SG § 12-106(c)(1). And it further provides that the notice requirement "does not apply if, within 1 year after the injury to person or property that is the basis of the claim, the State has actual or constructive notice of: (i) the claimant's injury; or (ii) the defect or circumstances giving rise to the claimant's injury." SG § 12-106(c)(2). Second, "compliance with the MTCA's notice requirement is not necessary in a suit against individual State personnel in which it is sufficiently alleged that the defendants acted with malice or gross negligence." *Francis v. Maryland*, Civ. No. ELH-21-1365, 2023 WL 2456553, at *28 (D. Md. Mar. 10, 2023) (citing *Barbre v. Pope*, 935 A.2d 699, 714 (Md. 2007)); *see also Andrews*, 2024 WL 520038, at *9.

Moore does not dispute Patterson's claim that she failed to submit a written claim to the State Treasurer or the Treasurer's designee within one year of the incident, which occurred on September 22, 2021. *See* ECF 27, at 4; ECF 48-1, at 33; ECF 53-1, at 28. However, Moore alleged in her first amended complaint that although she "maintains that there is no applicable immunity for State of Maryland statutory or common law claims . . . , [the] Complaint nonetheless complies" with the MTCA because Moore "submitted notice of [her] claims via United States Postal Service certified mail, return receipt requested, postage prepaid to the Frederick County Attorney on December 14, 2021." ECF 27, at 4 ¶ 13 (alterations added). Consequently, Moore asserted that the County of Frederick has "good and sufficient actual and/or constructive prior notice of all claims." *Id.*

However, neither party discusses substantial compliance in their briefing on the motion for summary judgment.[19] *See generally* ECFs 48 & 53. Instead, Moore contends that a reasonable factfinder could conclude that Patterson's conduct during and prior to the high-speed chase was grossly negligent, such that she need not have met the notice requirement of the MTCA. *See* ECF 53-1, at 26. Specifically, Moore asserts that Patterson's conduct prior to the chase involved him "pulling his gun without cause to do so" and that Patterson's conduct during the police pursuit was

---

[19] Moore's amended complaint may have been referencing the notice provision of Maryland's Local Government Tort Claims Act ("LGTCA"), which provides that an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim is given within one year of the injury. CJP § 5-304(a); *see also Bibum v. Prince George's Cnty.*, 85 F. Supp. 2d 557, 564 (D. Md. 2000). The LGTCA at one point required that notice be given to either the county solicitor or the county attorney, and still does in some cases. *See Bibum*, 85 F. Supp. 2d at 564; CJP § 5-304(b). But as discussed, "for law enforcement matters in general . . . sheriffs are considered state employees." *Brooks v. St. Charles Hotel Operating, LLC.*, Civ. No. DLB-23-0208, 2023 WL 6244612, at *8 (D. Md. Sept. 26, 2023). Regardless, because the Court concludes that Patterson is immune to Moore's state law claims irrespective of the notice requirement of the MTCA, it does not decide whether Moore substantially complied with the MTCA pursuant to SG § 12-106(c)(1). *See infra* Section II.C.2.

almost identical to the suspect of the Infiniti, who was charged with "reckless endangerment." *Id.*
Moreover, Moore points to the evidence of Patterson's conduct after the pursuit, which she
describes as "waiving his gun around and pointing it at innocent civilians, thereby putting them in
fear of death." *Id.*

"For MTCA purposes, malice is 'conduct characterized by evil or wrongful motive, intent
to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Nero v. Mosby*, 890 F.3d 106,
127 (4th Cir. 2018) (quoting *Barbre*, 935 A.2d at 714). "To establish malice, a plaintiff must show
that the government official 'intentionally performed an act without legal justification or excuse,
but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and
willfully injure the plaintiff.'" *Id.* (quoting *Bord v. Balt. Cnty.*, 104 A.3d 948, 964 (Md. App.
2014)). No evidence before the Court suggests that Patterson acted out of "hate" or "to deliberately
and willfully injure" Moore, and Moore does not appear to contend that Patterson acted with
malice. *See* ECF 53, at 28. Instead, Moore asserts that "[t]here are more than enough facts present
here, most of which are supplied by the Defendant's own written statements, for a reasonable jury
to conclude he was grossly negligent." *Id.*

"Gross negligence is 'an intentional failure to perform a manifest duty in reckless disregard
of the consequences as affecting the life or property of another,'—'something *more* than simple
negligence, and likely more akin to reckless conduct.'" *Nero*, 890 F.3d at 127–28 (internal
citations omitted) (first quoting *Cooper v. Rodriguez*, 118 A.3d 829, 845 (Md. 2015); and then
quoting *Barbre*, 935 A.2d at 717) (emphasis in *Barbre*). "A government official commits gross
negligence 'only when he or she inflicts injury intentionally or is so utterly indifferent to the rights
of others that he or she acts as if such rights did not exist.'" *Id.* at 128 (quoting *Cooper*, 118 A.3d
at 846); *see also Henry*, 652 F.3d at 536 ("An officer's actions are grossly negligent when they are

'so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a
gross departure from what would be the conduct of an ordinarily careful and prudent person under
the same circumstances so as to furnish evidence of indifference to consequences.'" (quoting *State
v. Albrecht*, 649 A.2d 336, 348 (Md. 1994))). Thus, Moore must point to specific evidence that
raises a reasonable inference that Patterson's actions were improperly motivated. *See id.* "The
question of gross negligence is typically a question for the jury but can be determined as a matter
of law when the facts clearly show that no reasonable jury could find that the defendant's actions
amounted to gross negligence." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 187 (4th Cir.
2018); *see also Henry*, 652 F.3d at 536.

The evidence adduced here is inadequate to permit a reasonable factfinder to conclude that
Patterson acted with gross negligence. As an initial matter, the Court declines Moore's invitation
to consider Patterson's conduct prior to and during the pursuit, as both occurred before the
allegations of her seizure. Moore does not assert a gross negligence claim against Patterson for
the events leading up to the crash, but rather a simple negligence claim, to which Patterson is
necessarily immune under the MTCA. *See Hicks*, 2020 WL 7624773, at *9 (holding that an officer
had statutory immunity from an ordinary negligence claim, as opposed to a gross negligence claim,
under the MTCA). Accordingly, the relevant conduct to assess for purposes of gross negligence
is not Patterson's conduct prior to and during the pursuit, but rather his alleged conduct upon
encountering Moore at the scene of the accident as that is the conduct upon which she ultimately
bases her remaining Article 26 and false arrest and imprisonment state tort violations against
Patterson. *See* ECF 27, at 9–8, 10–11.

A reasonable factfinder could not conclude on this record that Patterson was "so utterly
indifferent to the rights of [Moore] that he . . . act[ed] as if such rights did not exist.'" *See Nero*,

890 F.3d at 128. Moore attempts to characterize Patterson's conduct as "waiving his gun around and pointing it at innocent civilians, thereby putting them in fear of death." ECF 53-1, at 26. In light of the exigent circumstances created by the high-speed chase and subsequent crash, *see supra* Section III.A.1.iii, Patterson's conduct with respect to Moore was not "so heedless and incautious as necessarily to be deemed unlawful and wanton." *See Henry*, 652 F.3d at 536 (citation omitted). At worst, Patterson's display of his firearm in the direction of an injured Moore was *careless*, but does not, under prevailing law, amount to gross negligence. *See Dolgos*, 884 F.3d at 188 (concluding that there was insufficient evidence in the record for a reasonable jury to conclude that an officer acted maliciously or with gross negligence when she handcuffed a ten-year old not because she was "reasonably in fear for her or anyone else's safety" but instead was bothered by the child's "lack of remorse or concern for hitting" another child, and "removed the handcuffs about two minutes later" in response to the child crying and apologizing); *Boyer v. State*, 594 A.2d 121, 580 (Md. 1991) (holding that plaintiffs' allegations that an officer "drove at high speeds on a road congested with traffic in an attempt to apprehend a suspected intoxicated driver do not indicate that he acted with wanton or reckless disregard for the safety of others" even where it was alleged he "did not 'immediately' activate his emergency equipment and violated police procedures"). *Cf. Henry*, 652 F.3d at 536 (holding that a reasonable jury could find that an officer was grossly negligent in failing to make even a minimal effort to verify that he had drawn his taser instead of his firearm where making that check was implied in training, the officer kept both holstered on the same side of his body, and "there was no particular exigency").

### 2.    MTCA Immunity

Even if Moore has met the MTCA's notice requirement, Patterson argues that he is nonetheless immune to her state constitutional and common law tort claims under the MTCA

48

because Moore has not provided evidence from which a reasonable factfinder could conclude that he acted with actual malice or gross negligence. ECF 48-1, at 33; *see also Lee v. Cline*, 863 A.2d 297, 309–10 (Md. 2004) (holding that MTCA immunity encompasses constitutional torts and intentional torts). The MTCA provides that "[s]tate personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article." SG § 12-105. Section 5-522(b) provides, in relevant part, that state personnel "are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Cts. & Jud. Proc. ("CJP") § 5-522(b). The Court addresses the applicability of MTCA immunity to Moore's negligence claim first, and then to her remaining state law claims.

### i. *Negligence (Count V)*

Patterson argues that he is entitled to summary judgment on Moore's negligence claim because under the MTCA, only an action for gross negligence may lie against state personnel. ECF 48-1, at 34 (citing SG § 12-105). Furthermore, Patterson asserts that the record demonstrates as a matter of law that Patterson's actions do not come "close to the high gross negligence standard." ECF 56, at 14. Moore responds that the record supports "the claim that Deputy Patterson was grossly negligent and as such he does not have governmental immunity to the state negligence claim." ECF 53, at 3 ¶ 11. However, the substance of Moore's opposition on the issue of her state law tort claims only analyzes the issue of gross negligence in the context of whether she was required to comply with the notice requirements under the MTCA. *See* ECF 53-1, at 26–28.[20] Moore does not further address her claim for "negligence" against Patterson in her opposition. *See generally* ECF 53-1.

---

[20] In reply, Patterson asserts that Moore "now argues that she is asserting a claim for gross negligence." ECF 56, at 14 (citing ECF 53-1, at 26–28). However, Patterson incorrectly reads

As discussed, the MTCA provides that "a party can bring a viable tort action against the State when the tort was committed by a State employee acting within the scope of his or her employment and without malice or gross negligence." *Ford v. Balt. City Sheriff's Off.*, 814 A.2d 127, 134 (Md. App. 2002). "If, however, the State employee has acted with malice or gross negligence . . . , the State is immune from suit and the injured party may only bring a viable tort claim against the State employee." *Id.* at 120–21 (citations omitted). Thus, under Maryland law, "the tort 'liability of the State and [the tort] liability of individual State personnel are mutually exclusive. If the State is liable, the individual is immune; if the individual is liable, the State is immune.'" *Francis v. Maryland*, Civ. No. ELH-21-1365, 2023 WL 2456553, at *23 (D. Md. Mar. 10, 2023) (quoting *Marks v. Dann*, DKC-13-0347, 2013 WL 8292331, at *7 (D. Md. July 24, 2013) (alteration in *Marks*)).

Negligence and gross negligence are two distinct torts under Maryland law that are "mutually exclusive of one another." *Krell v. Braightmeyer*, 828 F. App'x 155, 160 (4th Cir. 2020) (citing *Barbre*, 935 A.2d at 717). Gross negligence "occurs when the defendant[] act[s] 'in reckless disregard of the consequences as affecting the life or property of another . . . without the exertion of any effort to avoid them . . . or [is] so utterly indifferent to the rights of others that [they] act[ ] as if such rights did not exist.'" *McDaniel v. Arnold*, 898 F. Supp. 2d 809, 849 (D. Md. 2012) (quoting *Barbre*, 935 A.2d at 717). "Put another way, gross negligence is 'something more than simple negligence, and likely more akin to reckless conduct.'" *Albero v. Worcester Cnty. Bd. of Commissioners*, Civ. No. JKB-24-1100, 2025 WL 462588, at *18 (D. Md. Feb. 11, 2025) (quoting *Cooper v. Rodriguez*, 118 A.3d 829, 854 (Md. 2015)). "Federal and state courts

---

Moore's discussion of gross negligence pursuant to the notice requirement of the MTCA as advancing the distinct argument that her claim is one of gross negligence.

alike have applied the gross-negligence standard" as equivalent to that of a recklessness standard. *Id.* As such, gross negligence "implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 173 (D. Md. 2023) (quoting *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018)) (internal quotation marks omitted).

Count V of Moore's complaint sounds in simple negligence, rather than gross negligence. *See* ECF 27, at 11 ("Count V. Negligence"), 12 ("Patterson acted in a negligent, careless, and wanton manner . . . ."). Moreover, although Moore argues in her opposition that Patterson was grossly negligent, she does not argue that the Court should construe Count V of her amended complaint as alleging gross negligence, rather than simple negligence. *See generally* ECFs 53 & 53-1. Where the conduct alleged falls short of malice or gross negligence, a state employee will be immune from liability where the alleged tortious act or omission was "within the scope of the public duties of the State personnel." *Hicks*, 2020 WL 7624773, at *9 (quoting CJP § 5-522(b)). "Maryland courts treat the MTCA's 'within-the-scope-of-employment requirement [as] coextensive with the common law concept of 'scope of employment' under the doctrine of respondeat superior.'" *Id.* (internal quotation marks omitted) (alteration in *Hicks*) (quoting *Nero v. Mosby*, 890 F.3d 106, 126 (4th Cir. 2018)). "[C]onduct falls within the scope of employment when it is 'authorized by the employer' and 'in furtherance of the employer's business.'" *Nero*, 890 F.3d at 126 (quoting *Larsen v. Chinwuba*, 832 A.2d 193, 200 (Md. 2003)). "The conduct need not be 'intended or consciously authorized,' so long as it is 'of the same general nature as that authorized' or 'incidental to the conduct authorized.'" *Id.* (quoting *Larsen*, 832 A.2d at 201).

There can be no doubt that Patterson was "undertaking conduct 'of the same general nature as that authorized' by" the Frederick County Sheriff's Office in responding to the accident and

securing the scene after the pursuit. *See Hicks*, 2020 WL 7624773, at \*9 (quoting *Nero*, 890 F.3d

at 126). Accordingly, as a state employee acting within the scope of his employment, Patterson

has statutory immunity from Moore's simple negligence claim. *See Hicks*, 2020 WL 7624773, at

\*9 (holding that an officer had statutory immunity from an ordinary negligence claim, as opposed

to a gross negligence claim, under the MTCA); *Krell*, 828 F. App'x at 160 (upholding a grant of

statutory immunity under the MTCA to police officers on mere negligence claims). Since suit

cannot lie against Patterson for mere negligence, he is entitled to summary judgment on Count V.[21]

> ii.    *False Arrest and False Imprisonment (Counts III and IV) and
> Article 26 (Count I)*

Patterson argues that the MTCA entitles him to immunity from Moore's remaining state

tort claims, including her false arrest and imprisonment claims, because the underlying conduct

for those claims was "conduct committed within the scope of their duties 'without malice or gross

negligence.'" *See* ECF 48-1, at 33; *Brooks v. McKimmie*, Civ. No. DLB-23-0208, 2025 WL

1018882, at \*14 (D. Md. Apr. 4, 2025). For the reasons stated above, the Court concludes that a

reasonable factfinder could not conclude Moore was grossly negligent with respect to the conduct

---

[21] Although Patterson does not raise this issue, the Court also observes that there may be significant causation issues with Moore's negligence claim. For the claim to survive summary judgment, a reasonable factfinder must be able to conclude that any negligence on the part of Patterson was "both a cause in fact of the injury and a legally cognizable cause." *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886 (D. Md. 2015) (quoting *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 351 (D.Md.2011)). "The 'cause in fact' inquiry 'concerns whether defendant's negligent conduct actually produced an injury.'" *Casey*, 823 F. Supp. 2d at 351 (quoting *Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009)). "Maryland courts consider two tests in determining whether causation-in-fact exists: the 'but for' test and the substantial factor test." *Id.* "The substantial factor test applies in situations where more than one independent negligent act may be responsible for a plaintiff's injury." *Id.* (citing *Young*, 667 F. Supp. 2d at 562). "Under the substantial factor test, an action is viewed as the cause of an injury only if the action was a 'substantial factor' in bringing about plaintiff's injury.'" *Id.* (internal quotation marks omitted) (quoting *Young*, 667 F. Supp. 2d at 562). However, because the parties have not addressed the issue of causation, the Court does not consider it further.

underlying Moore's Article 26 unlawful seizure claim. *See supra* Section III.C.1. Accordingly, Patterson is entitled to immunity under the MTCA on that claim, and summary judgment is warranted in his favor.

Turning to Moore's false arrest and imprisonment claims, Patterson argues that there is a more fundamental problem with those claims beyond whether the alleged conduct was grossly negligent: he asserts that "there is no evidence that Ms. Moore was ever arrested or imprisoned." ECF 48-1, at 34 (emphasis omitted). Under Maryland law, "the elements of false arrest and false imprisonment are identical: 1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (D. Md. 2002) (citing *Heron v. Strader*, 761 A.2d 56, 58 (Md. 2000)); *Okwa v. Harper*, 757 A.2d 118, 133 (2000) ("Although the intentional torts of false arrest and false imprisonment are separate causes of action, they share the same elements."). "False arrest and false imprisonment are evaluated under 'the principles applicable to the law of arrest.'" *Id.* (quoting *Montgomery Ward v. Wilson*, 664 A.2d 916, 926 (Md. 1995)).

Patterson argues that Moore is entitled to summary judgment as to the claim of "false arrest and false imprisonment" because "there is no evidence that Ms. Moore was ever arrested or imprisoned." ECF 48-1, at 34 (emphasis omitted). Patterson's argument raises the question of whether the Maryland tort of false arrest or imprisonment's first element—"the deprivation of liberty"—is satisfied where a seizure of the person occurs, rather than a full-blown arrest or subsequent incarceration. In "the vast majority of false arrest cases, [the] focus is on the last element," legal justification. *Rovin v. State*, 321 A.3d 201, 222 (Md. 2024). Consequently, discussion of the first element is sparse. Nevertheless, the Supreme Court of Maryland has stated that "'[a]ny deprivation of the liberty of another without his consent, *whether by violence, threats,*

*or otherwise* constitutes an imprisonment." *Fleisher v. Ensminger*, 118 A. 153, 159 (Md. 1922) (emphasis added). Although "there must be some direct restraint of the person[,] . . . confinement in jail or prison is not essential." *Mason v. Wrightson*, 109 A.2d 128, 131 (Md. 1954) (alterations added). "Any exercise of force, or threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." *Id.*; *see also Roshchin v. State*, 100 A.3d 499, 504 (Md. App. 2014) ("A defendant may be liable for false arrest or false imprisonment if the arrest, or the continued detention, is made without legal authority."), *rev'd on other grounds*, 130 A.3d 453 (Md. 2016)).

"Generally, the tort of false arrest or imprisonment 'requires some sort of volitional conduct that continually prevents the plaintiff from moving from his or her current space.'" *Nicholson v. Balt. Police Dep't*, Civ. No. DKC 20-3146, 2023 WL 4549741, at \*9 (D. Md. July 14, 2023) (first quoting *Gray v. Kern*, 124 F. Supp. 3d 600, 615 (D. Md. 2015), *aff'd in part, vacated in part sub nom. Gray by Gray v. Kern*, 702 F. App'x 132 (4th Cir. 2017); and then citing *Restatement (Second) of Torts* § 35 (Am. L. Inst. 1965)). "Often, in cases challenging police officer conduct, this requirement is easily satisfied by the occurrence of a custodial arrest." *Id.* (citing *Gray*, 124 F. Supp. 3d at 615). "In cases, however, not involving an arrest or a detention, a hallmark of false imprisonment is a continuing action on the part of the tortfeasor that restrains the movement of the plaintiff." *Id.* (quoting *Gray*, 124 F. Supp. 3d at 615). Accordingly, in cases where a seizure of the person occurs but no further action is taken to confine the person, or where steps are taken to help enable the person's removal from the area, courts have granted summary judgment in favor of an officer on a state law false imprisonment claim. *See, e.g., Gray*, 124 F. Supp. 3d at 615 (granting summary judgment on false imprisonment claim in favor of an officer who shot the plaintiff because the officer "took no further action to confine him" to a building and

instead "took steps to enable his removal from the building" by notifying another officer and calling 911); *see also Nicholson*, 2023 WL 4549741, at *9 (collecting cases).

Undisputed evidence reflects that after the initial alleged seizure, neither Patterson nor any other officer engaged in any further action to confine Moore to her vehicle or to the scene of the accident generally. *See* ECF 48-6, at 18–25 (describing the interaction with the officer who approached her vehicle and then noting that a paramedic "assisted [Moore] out of the car"). To the contrary, Moore stated at her deposition that after ordering her back into her vehicle, the officer "called for paramedics." ECF 48-6, at 20; *see also* ECF 48-4, at 179; ECF 48-8, at 17. Regardless, Moore "makes no argument either way about the sufficiency of" her false arrest and imprisonment claims. ECF 53, at 3; ECF 53-1, at 26. As discussed above, "[a] plaintiff's failure to respond to a summary judgment motion may constitute a waiver or abandonment of a claim." *Bell*, 2020 WL 978659, at *3 (quoting *Estate of Edgerton*, 2011 WL 6837560, at *4) (collecting cases). Because Moore has decided not to defend the viability of her suit insofar as it seeks to assert a false arrest and false imprisonment tort against Patterson, the Court concludes that Moore has waived her false arrest and false imprisonment claims. For all those reasons, summary judgment is awarded to Patterson on Moore's remaining Article 26 and false arrest and imprisonment claims.

## IV.    **TWO UNIDENTIFIED OFFICERS**

Moore's amended complaint also brings suit against two unnamed defendants, "Unknown Sheriff Deputy One" and "Unknown Sheriff Deputy Two." *See* ECF 27, at 1–2. Specifically, the amended complaint asserts Counts I, II, III, and IV against the unidentified officers. *See id.* at 7–11. Federal courts have observed that "[t]he idea of an unnamed defendant is contrary to the Federal Rules of Civil Procedure." *Myers v. City of Charleston*, No. 2:19-CV-00757, 2021 WL 925326, at *10 (S.D.W. Va. Mar. 10, 2021) (alteration added) (quoting *Price v. Marsh*, Civ. No. 2:12–cv–05442, 2013 WL 5409811, at *3 (S.D. W. Va. Sep. 25, 2013)); *see also* Fed. R. Civ. P.

10(a) ("The title of the complaint shall name all the parties . . . ."). Accordingly, "John Doe suits are permissible only against 'real, but unidentified, defendants.'" *Chidi Njoku v. Unknown Special Unit Staff*, 217 F.3d 840, at *1 (4th Cir. 2000) (table) (per curiam) (quoting *Schiff v. Kennedy*, 691 F.2d 196, 197 (4th Cir. 1982)). The designation of an unnamed defendant "is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." *Id.* (first citing *Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996); and then citing *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)); *see also Gordon v. Leeke*, 574 F.2d 1147, 1152–53 (4th Cir. 1978) (reversing denial of leave to amend complaint and noting that pro se plaintiff "should have been granted the opportunity to disclose the identity of" unnamed defendants).

The Fourth Circuit has thus held that "there is no basis to permit a judgment against an unidentified John Doe defendant to be sustained." *Id.*; *see also Myers*, 2021 WL 925326, at *10 ("[A] John Doe defendant must be identified by the time the issues are adjudicated on their merits, as the Fourth Circuit has determined that judgments may not be entered against unnamed defendants."); *Loftus v. Kanawha Cnty. Sheriff's Dep't*, No. 2:18-CV-01345, 2021 WL 2419449, at *4 (S.D.W. Va. May 19, 2021) (same), *report and recommendation adopted*, No. 2:18-CV-01345, 2021 WL 2418575 (S.D.W. Va. June 14, 2021). "Where a plaintiff 'has had ample time to identify' a John Doe defendant but gives 'no indication that he has made any effort to discover the [defendant's] name,' however, the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant." *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300–01 (S.D.N.Y. 2009) (quoting *Kearse v. Lincoln Hosp.*, No. 07–CV–4730, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009)) (collecting cases); *see also Cruz v. City of New York*, 232 F. Supp. 3d 438, 448–49 (S.D.N.Y. 2017) (collecting cases).

56

Moore filed her initial complaint in June of 2024, *see* ECF 1, and amended it once in September of that same year, *see* ECF 27. The parties reported that discovery was completed in April of 2025. ECF 44, at 1. Using due diligence, Moore has had ample time to identify the unnamed officers during the discovery process and to timely move to amend her complaint to specifically name those individuals as defendants but has not done so. *Cf. Blake v. Race*, 487 F. Supp. 2d 187, 192 n.1 (E.D.N.Y. 2007) ("Though discovery is complete in this case, plaintiff has failed to identify any of the unnamed defendants, or to present any evidence demonstrating their involvement . . . nor does plaintiff indicate that he will be able to identify these unnamed defendants in the future. . . . Thus, the 'John Doe' defendants are hereby dismissed without prejudice."). Accordingly, the Court orders Moore to show cause within fourteen (14) days of the issuance of this opinion and implementing order why the suit should not be dismissed as to the unidentified officers. If Moore chooses not to respond, the claims against the unidentified officers will be dismissed.

## V.    CLAIM AGAINST PEREZ

A return of service was filed on October 29, 2024 reflecting that service of process has been effected upon Perez. ECF 34. Perez's response to the amended complaint was due on or before November 8, 2024, but no response was filed. On December 4, 2024, Moore moved for the Clerk's entry of default against Perez. ECF 36. On December 5, 2024, the Clerk entered default as to Perez, ECF 37, and issued the accompanying notice of default, ECF 38. However, Moore has not yet filed a motion for default judgment. Accordingly, the Court orders Moore to file a motion for default judgment as to Perez, or provide a report as to why such a motion would be inappropriate, within fourteen (14) days of the issuance of this opinion and implementing order. If Moore does not file the motion or otherwise provide the Court with an update as to the litigation against Perez, the claim against Perez will be dismissed.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Moore's motion to file a surreply is granted, Patterson's motion for summary judgment is granted, Moore is ordered to show cause within fourteen (14) days of the issuance of this opinion and implementing order why the unidentified officer defendants should not be dismissed from the action, and Moore is ordered to file a motion for default judgment against Perez or file a report as to why such a motion would be inappropriate within fourteen (14) days of the issuance of this opinion and implementing order.

A separate implementing order will issue.

Dated: <u>January 13, 2026</u>

_____/s/_____

Brendan A. Hurson
United States District Judge
